UNITED STATES, Appellee,

v.

Roberto SANTIAGO–DAVILA, Sergeant,
U.S. Army, Appellant.

No. 56,250.
CM 447830.

U.S. Court of Military Appeals.

Aug. 29, 1988.

sessing 5.57 grams of marijuana on April 2, 1985; and violating a drug paraphernalia regulation on April 2, 1985, in violation of Articles 112a and 92, Uniform Code of Military Justice, 10 U.S.C. §§ 912a and 892, respectively.[1] The sentence adjudged was a dishonorable discharge, confinement for 7 years, total forfeitures, and reduction to the grade of E-1. The convening authority approved the findings and sentence, except his action regarding the discharge is ambiguous. The Court of Military Review affirmed the findings and sentence, holding the convening authority intended to approve a dishonorable discharge.

We granted these two issues for review:

### I

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY DENYING THE DEFENSE MOTION FOR APPROPRIATE RELIEF CONCERNING THE PRESENCE OF APPELLANT'S WIFE AT HIS COURT–MARTIAL.

### II

WHETHER THE MILITARY JUDGE ERRED IN FAILING TO INQUIRE INTO TRIAL COUNSEL'S USE OF HIS PEREMPTORY CHALLENGE AGAINST A COURT MEMBER OF APPELLANT'S SAME RACE AND NATIONAL ORIGIN.

We reject appellant's first contention but accept his second.

For Appellant: *Major Marion E. Winter* (argued); *Colonel Brooks B. La Grua* and *Lieutenant Colonel Joel D. Miller* (on brief); *Colonel John T. Edwards.*

For Appellee: *Captain Thomas L. Herrington* (argued); *Colonel Norman G. Cooper, Lieutenant Colonel Gary F. Roberson, Captain Richard Parker* (on brief); *Lieutenant Colonel Larry D. Williams.*

*Opinion of the Court*

EVERETT, Chief Judge:

On July 10, 1985, Sergeant Santiago-Davila was tried at Darmstadt, Federal Republic of Germany, by a general court-martial composed of officer and enlisted members. Contrary to his pleas, he was found guilty of wrongfully distributing 5.49 grams of marijuana on March 29, 1985, and 9.49 grams on April 1, 1985; wrongfully pos-

### I

### A

As a result of information provided by military police investigator (MPI) Diane M. Williams, an authorization was obtained to search appellant's apartment on April 2. During the search, agents found in various places a partially hand-rolled cigarette in which marijuana was present; a smoking device with marijuana residue; a Sucrets

---

**1.** Appellant was acquitted of attempting to distribute cocaine from April 1 to 2, 1985, and of possessing marijuana with intent to distribute on April 1, 1985.

box with marijuana residue; two plastic boxes in which marijuana was present; and an eyeglass case containing a little bag of marijuana seeds. Appellant was apprehended, and charges were preferred against him on April 29, 1985.[2]

Before appellant was arraigned on July 10, his civilian defense counsel moved that the testimony of appellant's wife be presented live by means of a change of the trial venue or by a videotaped deposition. In support of this motion, the defense presented documentary evidence to this effect:

(1) On April 11, appellant wrote his commander, Captain Richard Dalzell, to request that his "dependents not be returned to CONUS at this time." In this request he recited that he had "been advised that the United States Army intends to direct the return of my dependents (my wife and two minor sons) to CONUS in the near future"; that he was "accused of being involved with drugs as a distributor" and "there are allegations that I used my quarters (which I share with my family) as a distribution point"; that "drugs were allegedly seized from my quarters by agents of the Drug Suppression Team on 2 April 1985"; that "[m]y wife may well be a crucial witness in my case"; and that "[h]er presence will assist me in the preparation of my defense and she may be requested to testify for me at trial or at other appropriate times before trial."

(2) On April 26, 1985, the Deputy Community Commander had written appellant that, because of his wife's misconduct in aiding and abetting the distribution of drugs in appellant's government quarters, the community commander was "ordering the withdrawal of all logistic support (except medical care) and the advance return of your family members to be effective immediately. This action must be accomplished NLT 28 May 1985." The letter also advised that appellant could submit a written appeal from this decision "within seven calendar days."

(3) On April 26, 1985, appellant also had been notified that certain administrative actions were to be completed not later than May 28—namely, "[r]evocation of all privileges (except medical care) for all family members"; "[r]evocation of check-cashing privileges"; withdrawal of USAREUR driver's license; revocation of USAREUR privately-owned vehicle registration; revocation of USAREUR Ration Card; vacation of government quarters; and return of dependents to the United States.

(4) By an undated and unsigned letter, apparently submitted soon after receiving the notification from the Deputy Community Commander, appellant appealed the decision ordering the advance return of his dependents and withdrawal of their logistic support.

(5) On June 26, 1985, appellant "request[ed] that the Government make available at trial" appellant's wife, who then resided in Augusta, Georgia; and he stated that

it is expected that Mrs. Santiago will testify that the alleged paraphernalia seized on 2 April 1985 (subject of Charge I and its Specification), as well as the marijuana and marijuana residue seized on 2 April 1985 (subject of specification 4 of Charge II) were her property and hers alone and that her husband, the accused, knew nothing of the presence of either paraphernalia or marijuana.

The request also "noted that Mrs. Santiago's absence from the jurisdiction was occasioned by the Darmstadt Military Community directing her Early Return to the States despite protests of her husband, the accused" and that the Chief of Criminal Justice for the command had "stated on April 26, 1985, that, if Mrs. Santiago's testimony was material to any Charge or specification, that she would be brought back for trial, which is docketed for 10 July 1985."

---

**2.** On June 11, 1985, an additional charge was preferred with respect to possessing approximately 17.6 grams of marijuana on April 1, 1985, with intent to distribute. Appellant was subsequently acquitted of this charge. *See* n. 1, *supra.*

In answer to a question by the military judge, civilian defense counsel (IDC) informed him that appellant's appeal concerning the "advance return of dependents" had been denied. Trial counsel then responded that the Government did not dispute that appellant had made the request for his wife's presence as a witness or what her testimony would be. Then, trial counsel submitted documents indicating that, on June 28, he had requested that Mrs. Santiago be made available to testify and that funds be provided for her transportation—namely, $825.00 for travel and $225.00 per diem; but on July 5, 1985, an electronic message was received which advised that Mrs. Santiago "will not appear and testify as requested. Mrs. Santiago stated that she could not afford to leave her two small children. Mrs. Santiago wanted to know if she could submit a statement concerning the above mentioned GCM case."

Trial counsel, arguing against the defense motion, emphasized that Mrs. Santiago could not be subpoenaed to return to Germany; and he contended that, although her testimony was "relevant," it was "not essential" and "would not negate the Government's case." The defense replied that her testimony clearly was material and that a stipulation of expected testimony would not be sufficient. The defense also contended that the Army had forced Mrs. Santiago to leave Germany and that, if she were still in the country, her presence in court could be obtained through cooperation with German authorities. According to the defense, "the military judge should order either a change of venue, a video tape deposition or the abatement of" certain specifications to which her testimony would relate. "We believe that a drastic remedy is called for because of the Government's cavalier attitude in this case."

The military judge denied the defense motion. Then, upon defense request, the judge made special findings that the defense had not "done anything that has caused Mrs. Santiago's absence"; "that she is material to the specifications based upon the expected testimony"; and that

"the Government has asked her to come here, has made money available and she has decided not to come for her own personal reasons."

Answering a question from the judge as to "[w]hat else" the defense wanted the Government to do, the civilian defense counsel stated that "[t]he defense would have wanted them to concur in a video tape deposition or a change of venue or based upon her asserted reason that she cannot afford to leave her children alone, offer to pay for the flight of the children over here or for someone to watch them."

The judge then inquired whether the defense had "ask[ed] the Government to do that," and defense counsel replied, "We were not apprised until two days ago that the Government decided that they could not get her here." He "invite[d] the Government to join the defense in a motion for a continuance so that they may attempt to provide the cost for Mrs. Santiago and her children so that they all can be here and Mrs. Santiago can testify since it is only a financial issue and not a lack of willingness."

In response to the judge's question whether the defense had "any authority for" a "requirement that the Government provide for babysitters for the children," the civilian defense counsel maintained "that it is the Government's duty to attempt to use every reasonable means to secure her presence and if the only hindrance is a financial one, the Government is quite capable of resolving that problem since they caused it to begin with, that is, by sending the family away."

Trial counsel then suggested that "whether other people would babysit the children, that is speculation at this point"; and he noted that Mrs. Santiago

is staying with a family member, her own sister, and I don't want to get involved with what we can do with the children one way or the other. I mean I am not sure that it is only a financial difficulty either, after all, this is the defendant's wife. And the Government

would submit that there are other reasons involved as well, that we don't even know about and don't want to get into speculation.

Ultimately, the judge decided to abide by his original ruling.

B

When the court members assembled, five officers and five enlisted persons were present. Two of the members, Captain David Garcia and Sergeant First Class Edwin M. Rivera-Sanchez, had Hispanic surnames.

After preliminary instructions to the members, the military judge commenced *voir dire* with some general questions, which for the most part elicited negative answers.[3] Also, it was learned that one enlisted member was "a military policeman by MOS, but" assigned to "physical security" and that one officer was the rater of another. Trial counsel then also asked some general questions of all the court members.[4]

The civilian defense counsel, after determining that none of the members of the panel had any prior contact with him or the military defense counsel, asked each member to state his "[l]ength of time in service, where ... [he] grew up," and his "current duty position." Captain Garcia's answers to these questions were that he had 6 years of military service; had grown "up in upstate New York"; and was "currently the assistant S–3 of the 547th Engineer Battalion." Sergeant First Class Rivera-Sanchez had "19 years in the service"; had been "[r]aised in Puerto Rico"; and was "a Platoon Sergeant for A Battery, 6/56th ADA." Three members of the panel had previously served on courts-martial, but Garcia and Rivera had not.

None of the members had any prior relationship with trial counsel "beyond that of a normal professional relationship based on his being the prosecutor" in the command; and none would be more receptive to trial counsel's arguments "because he is the government representative in this case." None of the panel members knew the prospective government witnesses or had any "family member or close personal friend" who had "had a problem with ... controlled substances." All the "member[s] accept[ed] the principle that the accused has no duty or requirement to prove anything"; were willing to acquit, if the Government failed to prove its case beyond a reasonable doubt pursuant to the judge's instructions; and recognized that "cross-racial or cross-cultural identification" may be especially difficult. None of the members would give special weight to the testimony of military policemen.

All members indicated that they would perform any sentencing on an individualized basis and take into account "the lack of any aggravating factors" and that they could consider "the full range of punish-

---

**3.** None of the court members knew Sergeant Santiago; felt that he could not give the accused a fair trial; had any prior knowledge of the facts; had anyone in his family who had been charged with an offense similar to those of which Santiago was accused; would consider anything heard in some previous court-martial in which the member might have served; had any quarrel with the presumption of innocence or the requirement of proof beyond a reasonable doubt; would infer that appellant was guilty merely because the charges had been referred for trial; had any legal training or experience other than what was generally received by military persons of the same rank or position; would give more or less weight to a witness' testimony solely because of the witness' position or status; had any prior dealings with any of the parties which might affect the performance of the court member's duties; or had any pre-

disposition toward a particular punishment. Each member claimed he could sentence the accused on an individual basis and was unaware of any matter which might raise a substantial question concerning his participation as a court member.

**4.** None of the court members would require that the Government prove its "case beyond all doubt"—as distinguished from a reasonable doubt—or would be "lenient" to the accused "solely because he has been in the military for some time." Also, all the members would take into consideration "direct as well as circumstantial evidence"; use their "common sense in evaluating the credibility of witnesses as well as all the evidence presented"; and "consider potential friendships in evaluating credibility of witnesses."

ment from the sentence of no punishment up to the maximum, whatever it might be." Only one member, Captain Garcia, indicated he believed that he would "feel compelled to punitively discharge the accused if he is convicted of distribution"; but upon clarification of the question that had been posed, this member changed his answer to the negative.

Lieutenant Colonel Daves, upon separate questioning, indicated that, when growing up in Texas, he "had a lot of contact" "with people of Hispanic descent." He thought it was "difficult" "to identify individual Hispanics." But, in response to a question from trial counsel, Daves said that he did not "believe that everyone has a problem with identifying members of other races." For example, he felt that he "could more easily identify them than maybe someone else who has not grown up with them."

Master Sergeant Budrow, who "had a military-police background," described the various types of service that he had performed. Lieutenant Colonel Lempke testified that he would not be inhibited in any discussions during deliberations because of his being rated by Colonel Leyda. First Sergeant Bradshaw explained that, even though Staff Sergeant Roberts was one of his platoon sergeants, he did not believe this would inhibit the performance by Roberts of his duties as a court-member.

After completion of *voir dire*, neither the prosecution nor defense had a challenge for cause; but the Government peremptorily challenged Sergeant First Class Rivera-Sanchez. Thereupon, the IDC stated:

Prior to the exercise of the defense's peremptory challenge, Your Honor, we would request that the bench inquire into the Government's use of a peremptory challenge in a seemingly discriminatory manner to remove one of the two Hispanics on the panel with the accused being a Hispanic. The California Supreme Court in the State of [sic] People versus Wheeler, which is at 583 Pacific 2nd 748, and 24 Criminal Law Reporter 2069, held that there was a basis for doing this. I realize that it is a state court rather than a

military court. There is a similar requirement in the States of Massachusetts, New Mexico, and the US District Court for the Eastern District of New York adopting those standards in California. We are not saying that the Government has used their challenge in that manner. However, in the absence of any apparent basis from voir dire, either collective or individual, the defense believes it is appropriate of the military judge to inquire into that area.

When asked by the military judge if it was the defense "position that the Government could not remove a member because" he was "Hispanic," the defense replied:

[N]o party is permitted or should be permitted to racially selectively make challenges.... [T]here is a presumption that a peremptory challenge is being used in a Constitutional matter [sic], but this may be rebutted by a prima facie showing of discrimination. We are not saying that such a showing has been made. We are merely asking the trial court to inquire of the Government in order to establish on the record if in fact such a basis existed or if there is other— are other bases that the Government had.

By way of clarification, defense counsel later added:

In the case where the accused is a Hispanic and where it is clear from the questioning in voir dire and from the evidence that the Government is aware of that there will be an identification of Hispanics, believe that the potential for abuse exists in allowing the challenge to go unquestioned. We are not stating for the record we feel it to be improper. But we do believe that as a principle, peremptory challenges may not be used in a discriminatory manner to affect the composition of a voir dire of the panel.

The military judge asked, "Isn't the basis for a jury selection different in the civilian community than it is in the military?" He went on to suggest that the California case on which defense counsel was relying had been "based on ... a Constitutional right

... to a jury drawn from a fair cross-section of the community"—a principle inapplicable to courts-martial. The military judge also noted that the Discussion to R.C.M. 912(g)(1), Manual for Courts-Martial, United States, 1984, notes that no reason need be stated for exercising a peremptory challenge.

Trial counsel then contended that the defense was relying on a State court decision which "presupposes a different system than we have in this court," and that "based on the questions asked there is no evidence whatsoever to suggest discrimination." He added, "Now, if you should decide that you want to inquire, the Government will give you an answer if you want to know why." To this offer, the military judge responded: "Well, I don't intend to inquire. If you want to state something for the record, ... feel free to do so." Trial counsel declined, and the military judge then stated:

> Well, I know of no authority to inquire of the Government other than what you have provided the court, and I will abide by the Manual for Courts-Martial and not inquire of the defense or the Government of the basis of their peremptory challenge.

After the defense had used its peremptory challenge to remove an officer member, Colonel Leyda, from the panel, the trial commenced.

### C

The principal government witness was MPI Diane Williams, a member of the Drug Suppression Team. According to her testimony, she and a "registered source," Specialist Four Gregory Hilliard, had gone to appellant's apartment at about 9:00 p.m. on March 29, 1985. After Hilliard introduced her to appellant, they went into "a rear room," where appellant told them "that he did not have any more cocaine left. That it had gone fast. And that he had sold it all." When Hilliard asked appellant "if he had anything for the head," appellant "went to the bathroom" where Williams saw him take out a small tin box that resembled a Sucrets box. He opened the box, which contained some 30 to 35 "foil wrapped packets"; and MPI Williams bought four for $80. After Williams left the apartment, she immediately delivered the drugs she had purchased to another investigator—tests proved them to be hashish.

On April 1, at about 9:10 p.m., Williams returned to the apartment. "Mrs. Johnson answered the door and invited" Williams and "the registered source" inside. Appellant was not in the apartment at that time, but he later appeared and came over to Williams. When she "asked him what was up," he replied that he was "supposed to be getting some" cocaine "tomorrow night." Thereupon, he "sold" Williams "seven pieces of purported hashish for $120"—after removing them from "another tin similar to the one on 29 March." Once again, upon testing, the drugs purchased proved to be hashish.

On the afternoon of April 2, Williams met appellant at a bookstore. "He was dressed in his BDUs"; and he had on a name tag which said "Santiago." Appellant told her that everything was "still set" to sell her cocaine at 5:00 p.m. that evening.

After MPI Williams had reported these events, a search authorization was given; and she was issued some money. She met appellant in the stairwell just outside his apartment, and he "invited" her inside. He then told Williams "that his friend did not arrive with the cocaine that was supposed to have been delivered, that he had to go and pick it up." However, "he had to wait until his wife returned from work so she could watch the kids." Subsequently, Williams went back to appellant's apartment. His wife came to the door and told her that appellant "was not there. She would not let" Williams inside. Later, Williams returned again to the apartment; but Santiago, who by then had returned, told her that he had not been able to get any cocaine. Shortly thereafter, the search authorization was executed, and appellant was apprehended. According to Williams,

Santiago was "the same individual" she had been "introduced ... to on March 29." She claimed that she had no problem "identifying Hispanics" and that she had "dealt with" them before.

MPI Harold Henderson corroborated some aspects of MPI Williams' testimony, and Special Agent Daniel A. Stevens described the search of Santiago's apartment on April 2, 1985. Twelve items had been seized in various parts of the apartment. Among them was a Sucrets box with marijuana residue. Six of the twelve items seized did not contain controlled substances.

After the Government rested,[5] the defense offered into evidence a stipulation of Mrs. Santiago's expected testimony which stated:

> The paraphernalia found in Apt A–6, Building 4401, Lincoln Village, Darmstadt, FRG on 2 April 1985 belonged to me alone. My husband, the accused, did not even know I had it all there, any more than he knew that the marijuana found there was mine.
>
> I never told him about my drug involvement because I knew that he would disapprove.

The defense offered a stipulation of fact that Mrs. Santiago "was offered invitational travel orders to return to Darmstadt, FRG, for the purpose of testifying in this trial. She declined to accept the orders." Also there was a stipulation that Dr. Vito Trezza, "a qualified expert in the field of visual perception with knowledge in the area of cross-racial and cross-cultural eyewitness identification," would testify that "[t]here is a definite problem with the value of cross-racial and cross-cultural eyewitness identification." The stipulation also described some of the factors that, in Dr. Trezza's opinion, would affect the accuracy of such identification. Master Sergeant Diaz testified for the defense that at 9:00 p.m. on March 29, 1985, he had seen appellant at a carnival.

Specialist Four Gregory Hilliard testified as a rebuttal witness that he had seen appellant on the morning of March 29, when appellant offered to sell him some cocaine, and that later he went to appellant's apartment with MPI Williams. At that time Santiago had said that he did not have any cocaine; but he had sold them some hashish, which had been wrapped in aluminum foil and was in a Sucrets box. After Williams had paid appellant, they returned to the CID office with the drugs. On April 1, he and Williams had again returned to appellant's apartment; Santiago had come in; and once again Williams had bought hashish from appellant, who had it in the Sucrets box. He was sure that the person with whom they had dealt was Sergeant Santiago. Hilliard was cross-examined extensively, and subsequently the defense called a surrebuttal witness to contradict Hilliard's account of having seen appellant on the morning of March 29.

At the end of all the evidence, the military judge instructed the court members on the elements of the offenses, alibi, and other matters. Thereafter,[6] each counsel presented final argument.

The defense contended that, although MPI Williams had not lied, she was mistaken—this mistake resulting from the "difficulty in cross-racial, cross-cultural identification." According to the defense, someone other than the accused had conducted the drug transactions with MPI Williams on March 29 and April 1. Moreover, in connection with the stipulation of Mrs. Santiago's expected testimony, the defense argued that she had declined to accept the invitational orders to return to Germany because she would be testifying to having committed

> an illegal action in Germany. The fact that she was in possession of paraphernalia and in possession of marijuana. She might not be subject to the military

---

5. At this time, the defense moved successfully for a finding of not guilty as to the attempted distribution of cocaine on April 1–2.

6. *See* R.C.M. 920(b), Manual for Courts-Martial, United States, 1984.

if she came here and said it, but she sure as heck would be subject to the Germans. Does that suggest anything about the truthfulness of the statement? I mean family loyalty only goes so far. It may be a bitter pill for the accused to accept on a familiar level. But on a legal level what does it tell you about the statement of expected testimony, and its likelihood of being believed.

After the arguments, the military judge instructed the members on the procedures to be applied in their voting. The court closed, and after little more than half an hour, they returned their findings of guilty.

## II

In connection with the absence of Mrs. Santiago, the Government disclaims any responsibility for her return to the United States from Germany. The contention is made

that dependents of a service member enjoy the same travel privileges as other citizens of the United States; therefore, the military service cannot 'force' a non-servicemember dependent traveling or living abroad to return to the United States any more than they can preclude dependents from traveling at their own expense and residing in the vicinity of a servicemember's duty station. The Government's only action impacting upon the witness' appearance at trial was the withdrawal of command sponsorship.

In the abstract, this contention may seem plausible; but it is naive as applied here. In view of the action taken by the community commander, Santiago had no real choice but to send his wife and children back to the United States. In the absence of Government quarters, it would have been unfeasible for Mrs. Santiago or the children to remain in Germany. Moreover, the notification to appellant specifically directed that he return his dependents to the United States; and failure to do so might have led to sanctions against appellant.

The purpose of the government action, however, was entirely reasonable. Since the seized evidence indicated that Mrs. Santiago had been participating with her husband in distributing drugs in the government quarters they occupied—or, at least, that she was well aware of such distribution—and since American military authorities had no criminal jurisdiction over her,[7] it was appropriate for them to take administrative action to prevent further criminal activity on her part or in her dwelling. The only limitation was that the Government not act with any purpose to deprive appellant of her testimony and that it make reasonable efforts to have her available to testify at trial.

The record reveals that the Government performed its obligations to the accused. Since no subpoena power existed to force Mrs. Santiago to return from the United States, *see United States v. Crockett,* 21 M.J. 423 (C.M.A.), *cert. denied,* 479 U.S. 835, 107 S.Ct. 130, 93 L.Ed.2d 74 (1986); *United States v. Bennett,* 12 M.J. 463 (C.M.A.1982), the Government offered invitational travel orders with all expenses paid.

Mrs. Santaigo's express reason for refusing to return was that she would have no one to take care of her children. This difficulty does not seem insoluble, since she was living at her sister's home and her expected absence was to be only 4 days. Of course, if Mrs. Santiago had claimed that at some time in the near future she could obtain necessary child care and then could return to Germany to testify, the situation might be more akin to that in *United States v. Cokeley,* 22 M.J. 225 (C.M.A.1986). Here, however, nothing indicates that a postponement of the trial would have assured her presence. Indeed, in arguing to the court members, appellant's civilian defense counsel contended that Mrs. Santiago would not return to Germany because she might then be sub-

---

**7.** *Kinsella v. Singleton,* 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960); *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

ject to prosecution by German authorities after testifying on her husband's behalf. Under these circumstances, we cannot accuse the Government of having been remiss in obtaining her attendance.

The defense suggested as an alternative that her testimony be presented by means of a videotaped deposition. Such depositions are a useful means of presenting to the factfinder the testimony of a witness whose presence in court cannot be obtained, *see United States. v. Crockett, supra;* and videotaped depositions are being increasingly used in both military and civilian practice.

■ Nonetheless, the military judge has some discretion in selecting among alternatives for the in-court testimony of an unavailable witness. The delay, difficulty, and cost involved in obtaining a videotaped deposition were factors that the judge could weigh against the greater detail and effect of a videotaped deposition. Under the circumstances of this case, we do not believe that he abused his discretion in opting for a stipulation of expected testimony.

■ Furthermore, we have examined the record with care to determine whether, if the judge erred in his choice of alternatives, appellant was injured thereby; and we are convinced beyond a reasonable doubt that no prejudice resulted here.

As to the two distribution charges, the primary issue was whether MPI Williams had misidentified appellant or whether some other Hispanic had carried out the drug sales in appellant's apartment on March 29 and April 1. The defense contention was that MPI Williams had "difficulty in" making the "cross-racial, cross-cultural identification" of appellant, who is a Puerto Rican.[8] They did not claim that Williams was fabricating her account or that drug sales had not taken place in appellant's apartment.

Mrs. Santiago's testimony would not have affected the findings as to the distri-

bution offenses. If the court members concluded—as they did conclude—that Sergeant Santiago made the two sales of hashish to MPI Williams, we do not believe that, if his wife had testified by videotaped deposition or in person, the members would have found that he was unaware of the presence in his apartment of the paraphernalia and marijuana found there in various places during the search on April 2. Moreover, contrary to his wife's stipulated testimony, Santiago would have no reason to "disapprove" her "drug involvement," if he was distributing drugs himself in their apartment. If appellant had knowledge of the presence of the drug paraphernalia and marijuana, then, under the circumstances here, he was, at least, in constructive joint possession of these items with his wife.

In short, we are convinced that the Government did all that was required of it; that Mrs. Santiago would not have returned to testify, even if the Government had done more; and that appellant fared no worse with her stipulated testimony than he would have with a videotaped deposition or even with her live testimony.

### III

■ As trial counsel pointed out, the defense objection to the Government's exercise of its peremptory challenge against Sergeant First Class Rivera-Sanchez referred to *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), which relied on a right under the California Constitution to a jury panel drawn from a representative cross-section of the population. No corresponding right exists in a court-martial; and, indeed, Article 25 of the Uniform Code, 10 U.S.C. § 825, contemplates that a court-martial panel will not be a representative cross-section of the military population.

■ *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)—which was decided after appellant's trial—is not based on a right to a representative cross-

---

8. Presumably, in the defense view Hilliard's testimony suffered from the same defect—although he had far more previous contacts with appellant than had Williams.

section on a jury but, instead, on an equal-protection right to be tried by a jury from which no "cognizable racial group" has been excluded. *See id.* at 96, 106 S.Ct. at 1723. This right to equal protection is a part of due process under the Fifth Amendment, *see Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); and so it applies to courts-martial, just as it does to civilian juries.[9]

Even though decided after the trial of appellant's case, *Batson* cannot be disregarded here, for the Supreme Court has applied it retroactively to trials that preceded its rendition. *See Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); *United States v. Carter,* 25 M.J. 471 (C.M.A.1988). Furthermore, even if we were not bound by *Batson,* the principle it espouses should be followed in the administration of military justice. In our American society, the Armed Services have been a leader in eradicating racial discrimination. With this history in mind, we are sure that Congress never intended to condone the use of a government peremptory challenge for the purpose of excluding a "cognizable racial group."

■ The Government contends that, under R.C.M. 905(e), the defense waived any equal-protection claim by relying on *People v. Wheeler, supra*—a State case based on the right to have a representative cross-section of the community on a jury panel. Although this right is inapplicable to courts-martial, we do not choose to apply the doctrine of waiver so strictly—especially when we are dealing with a fundamental constitutional right not to be the victim of purposeful racial discrimination and when the defense has asserted a closely-related constitutional claim.

■ Observing that *Batson* deals only with use of peremptory challenges to exclude "member[s] of a cognizable racial group," 476 U.S. at 96, the Government suggests that purposeful exclusion of Puerto Ricans would fall outside *Batson* because Puerto Ricans are not "a cognizable racial group." However, *Batson* relied on *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), which concerned exclusion of Mexican-Americans from grand juries in a Texas county.[10] Since Mexican-Americans constitute "a cognizable racial group," we believe the same is true of Puerto Ricans—although we recognize that neither group fits squarely within the concept of "race" employed sometimes by anthropologists.

"Puerto Ricans" have often been treated as a separate "racial group." For example, in implementing its affirmative action program, the Department of the Army uses such a category. *See* Table 1–2, Department of Army Pamphlet 600–26, *Department of the Army Affirmative Action Plan* (December 13, 1985). For purposes of aid to a "[m]inority business enterprise," separate categories are recognized for "Negroes, *Puerto Ricans,* Spanish-speaking Americans, American Indians, Eskimos, and Aleuts." *See* § 6(a), Exec. Order No. 11,625, 36 Fed.Reg. 19,967 (Oct. 13, 1971) (emphasis added). In other instances, there has been special legislative or administrative treatment of "Hispanics." Thus,

---

**9.** A recent commentary points out that there are three differences between a Sixth-Amendment right to "a representative cross-section of the population" on a jury panel and an equal-protection right that no "cognizable racial group" be purposely excluded: (1) Only a member of the excluded group can assert an equal-protection violation; (2) "only the exclusion of racial classes can be challenged under *Batson*"; and (3) "*Batson* has no immediate effect upon the [defense's] use of peremptor[y challenges] in a racially discriminatory manner." *See* Uelmen, *Striking Jurors Under Batson v. Kentucky,* 2 Criminal Justice (published by A.B.A. for its

Section of Criminal Justice) 3–4 (Fall 1987). The en banc United States Army Court of Military Review has recently discussed in detail applicability of *Batson* to trials by court-martial. *See United States v. Moore,* 26 M.J. 692 (1988), *pet. filed,* 26 M.J. 311 (Daily Journal June 1, 1988).

**10.** *See also Hernandez v. Texas,* 347 U.S. 475, 476, 74 S.Ct. 667, 669, 98 L.Ed. 866 (1954) (exclusion of "persons of Mexican descent" from jury service).

for purposes of applying for certain licenses, "the term 'minority group' includes Blacks, Hispanics, American Indians, Alaska Natives, Asians and Pacific Islanders." 47 U.S.C. § 309(i)(3)(C)(ii) (1988 Pocket Part).[11] In view of the widespread recognition of "Puerto Ricans" and "Hispanics" as "minorities," we are convinced that they should also be considered "a cognizable racial group" for purposes of applying *Batson* to courts-martial.[12]

■ The Government next contends that the defense has failed to establish a prima facie case of purposeful exclusion. In *Batson*, the prosecutor used four of six allowable peremptory challenges to excuse all the black persons on the panel; and the majority opinion remanded for a determination of whether there had been purposeful discrimination of blacks from the jury panel. In the present case, as the Government emphasizes, only one of two persons with Hispanic surnames was removed; and so there was not a total exclusion of Hispanics.

Perhaps the showing of purposeful exclusion would have been stronger if the Government had been entitled to exercise two peremptory challenges and had used both to exclude the only two members of the panel with Hispanic surnames. However, we do not believe it decisive that a prosecutor runs out of his peremptory challenges before he can exclude all the members of a particular group. *See* Uelman, *Striking Jurors Under Batson v. Kentucky*, 2 Criminal Justice (published by A.B.A. for its Section of Criminal Justice) 4 (Fall 1987). The fact remains that appellant is a Puerto Rican and that the Government utilized its only peremptory challenge to excuse the only court member with an Hispanic surname who "grew up" in Puerto Rico.

The Government suggests that, even though Rivera had an Hispanic surname and "grew up" in Puerto Rico, he may not have been a Puerto Rican, as that term is generally used. Instead, he might have been a Spaniard, Cuban, Mexican, or native of some other country, who happened to have been reared in Puerto Rico by his parents. On the other hand, Captain Garcia, who had an Hispanic surname but was not challenged, might have been a Puerto Rican, whose family had moved to New York, where he "grew up." From such speculation, the Government concludes that trial counsel's peremptory challenge of Rivera may have removed from the panel a member who was not a Puerto Rican and left there Captain Garcia, who was a member of this "racial group."

Although this possibility may exist, we consider it too remote to forestall application of *Batson* to this case. Of special importance to us in reaching our conclusion is the absence of anything in the *voir dire* or elsewhere in the record which clearly indicates to us some reason other than race which led to trial counsel's peremptory challenge of Sergeant First Class Rivera-Sanchez.[13] Conceivably, Rivera-Sanchez'

---

11. Statutory provision is made for obtaining "unemployment data relating to Americans of Spanish origin or descent." See 29 U.S.C. § 8. The Department of Commerce was required to "implement an affirmative action program within the Bureau of the Census for the employment of personnel of Spanish origin or descent." Pub.L.No. 94–311, § 6, 90 Stat. 688, 689 (1976).

12. In *Webster's New Collegiate Dictionary* 950 (1977), one definition of "race" is "a division of mankind possessing traits that are transmissible by descent and sufficient to characterize it as a distinct human type." Other definitions include "a family, tribe, people, or nation belonging to the same stock"; and "a class or kind of people unified by community of interests, habits, or characteristics." According to *Black's Law Dictionary* 1132 (5th ed. 1979), "Race" is: "An ethnical stock; a great division of mankind having in common certain distinguishing physical peculiarities constituting a comprehensive class appearing to be derived from a distinct primitive source."

13. As the Supreme Court observed in *Batson:*

In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, *the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support*

grade or years of service induced trial counsel's decision to challenge him; but this is unlikely since it is our impression that prosecutors usually prefer senior court members.

Appellant is as entitled to invoke *Batson* as was the defendant in *Saadig v. State*, 387 N.W.2d 315, 326–29 (Iowa 1986). In that case, which was decided soon after *Batson* and applied that decision, the defendant was black; and the prosecutor used his fourth peremptory challenge to excuse the only black on the jury. The Iowa Supreme Court concluded that the defense had established a prima facie case of purposeful exclusion "of a cognizable racial group," *id.* at 328, and that the remedy was to remand to the trial court for it "to find under *Batson* whether the prosecutor did or did not purposefully discriminate in striking the black … juror." *Id.* at 329. We reach a similar conclusion here.

At the time of trial, the military judge did not have the guidance of *Batson;* and instead he was confronted by a Manual suggestion that the reasons for exercising peremptory challenges need not be stated. This provision is akin to that which applies to peremptories in most civilian courts. Just as *Batson* requires limited disclosure of the reason for exercising peremptory challenges in a state or federal criminal trial, so, too, the Manual's provision that no reason be disclosed for peremptory challenges must yield to *Batson.*

 In *Batson*, the Supreme Court explained that "[o]nce the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." 476 U.S. at 97, 106 S.Ct. at 1723. However, the prosecutor may not

> rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirm[ing] [his] good faith in making individual selections.' *Alexan-*

*der v. Louisiana*, 405 U.S. [625] at 632 [92 S.Ct. 1221, 1226, 31 L.Ed.2d 536, 1972]. If these general assertions were accepted as rebutting a defendant's prima facie case, the Equal Protection Clause 'would be but a vain and illusory requirement.' *Norris v. Alabama*, [294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935) ] *supra*, at 598 [55 S.Ct. at 583–84]. The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the defendant has established purposeful discrimination.

476 U.S. at 98, 106 S.Ct. at 1723–24. These observations apply equally to the present case and to any other trials by court-martial where the accused makes a prima facie showing that the Government has used a peremptory challenge to purposefully exclude "a member of a cognizable racial group." *Id.* at 96, 106 S.Ct. at 1723.

The Supreme Court in *Batson* also asserted that, despite any threatened administrative problems, "[w]e have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Id.* at 97, 106 S.Ct. at 1723. Likewise, we have confidence that military judges will be equally able to deal with this issue whenever it arises.[14]

## IV

The Government has not submitted any affidavit from trial counsel to attempt to articulate a neutral explanation for the exercise of his peremptory challenge. Therefore, we have no occasion to determine whether, under the circumstances here or under some other circumstances, an affidavit might suffice to disprove an intent to

---

or refute an inference of discriminatory purpose. These examples are merely illustrative. 476 U.S. 79, 96–97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986).

**14.** If the military judge had ruled at trial that no showing of purposeful discrimination had been

made by the defense, it might give us more pause. However, under the judge's interpretation of the law, he had no occasion to make such a determination.

exclude "a member of a cognizable racial group," *id.* at 96, 106 S.Ct. at 1723, or whether, instead, *Batson* requires in every instance that an accused be provided an opportunity for cross-examination of the prosecutor.

The decision of the United States Army Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Army for referral to an officer exercising general court-martial jurisdiction for the purpose of ordering a limited hearing on the reasons for the peremptory challenge by the prosecution.[15] The findings and conclusions of the military judge at this hearing, or notice of the convening authority's determination that such a hearing is impracticable, should be provided by appellee directly to this Court.

Judge SULLIVAN concurs.

COX, Judge (concurring):

I concur.* However, to put uniformity into the Uniform Code of Military Justice, I would adopt the *per se* rule articulated by

the en banc United States Army Court of Military Review in *United States v. Moore,* 26 M.J. 692 (1988), *pet. filed,* 26 M.J. 311 (Daily Journal June 1, 1988).

As I read the *Moore* opinion, it suggests that trial counsel should give the convening authority credit for having wisely selected as members those who "are best qualified ... by reason of age, education, training, experience, length of service, and judicial temperament," Art. 25(d)(2), UCMJ, 10 U.S.C. § 825(d)(2), by not challenging members of an accused's race peremptorily unless there is good reason to do so. *See United States v. Carter,* 25 M.J. 471, 477 (C.M.A.1988) (Cox, J., concurring).

In short, although the Government enjoys a peremptory challenge, sound practice would suggest using it sparingly and only when a challenge for cause has not been granted. If the grounds for the challenge for cause are on the record, *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), will most likely be satisfied.

---

15. *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967).

* The only thing that bothers me about this is that I don't know what impact it will have on the "Hound Dog Rule."