# United States Navy–Marine Corps Court of Criminal Appeals

---

**UNITED STATES**
*Appellee*

v.

**Willie C. JETER**
**Lieutenant Junior Grade (O-2), U.S. Navy**
*Appellant*

---

**No. 201700248**

---

Appeal from the United States Navy-Marine Corps Trial Judiciary

*Military Judges:*
Commander Heather Partridge, JAGC, USN (arraignment);
Commander Jason L. Jones, JAGC, USN (trial).

*Sentence Adjudged:* 14 April 2017 by a general court-martial convened at Region Legal Service Office, Norfolk, Virginia consisting of officer members.

*Approved Sentence:* Dismissal and confinement for 20 years.

*For Appellant:* Captain Thomas R. Fricton, USMC.

*For Appellee:* Captain Luke Huisenga, USMC;
Captain Brian L. Farrell, USMC.

---

*Argued:* 16 October 2018—*Decided:* 03 January 2019

---

Before WOODARD, HUTCHISON, and LAWRENCE,
*Appellate Military Judges*

---

## PUBLISHED OPINION OF THE COURT

_____

HUTCHISON, Senior Judge:

A general court-martial consisting of officer members convicted the appellant, contrary to his pleas, of violating the Navy's sexual harassment instruction, drunken operation of a vehicle, sexually assaulting two different women, extortion, burglary, conduct unbecoming an officer, communicating a threat, and unlawful entry, in violation of Articles 92, 111, 120, 127, 129, 133, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 911, 920, 927, 929, 933, and 934 (2012).[1] The members sentenced the appellant to 20 years' confinement and a dismissal. The convening authority (CA) approved the sentence as adjudged and, except for the dismissal, order it executed.

The appellant raises 11 assignments of error (AOE):[2] 1) removing minority and female members from the court-martial panel violated the appellant's Equal Protection and Due Process rights; 2) the CA committed actual or apparent unlawful command influence by stacking the members panel entirely with white men; 3) the military judge erred in admitting evidence and instructing the members on the appellant's motive and intent; 4) the appellant's conviction for sexual assault by bodily harm is legally and factually insufficient; 5) the appellant's conviction for sexually assaulting his victim while she was asleep is legally and factually insufficient;[3] 6) the appellant's conviction for sexual assault by threatening or placing his victim in fear is legally and factually insufficient; 7) the appellant's conviction for drunken operation of a vehicle in violation of the Virginia Code is legally and factually insufficient;[4] 8) the military judge erred by denying the appellant's request

_____

[1] After announcement of the findings, the military judge conditionally dismissed the sexual harassment specification, one of two specifications of drunken operation of a vehicle, one of three specifications of sexual assault, and one of two specifications of unlawful entry. Record at 958.

[2] We have renumbered the AOEs.

[3] The military judge conditionally dismissed this specification. *See* Record at 958 (conditionally dismissing Charge III, Specification 2). Our resolution of AOE IV, affirming the appellant's conviction to Charge III, Specification 1, renders this AOE moot.

[4] Raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). The military judge conditionally dismissed this specification. *See* Record at 958 (conditionally dismissing Charge II, Specification 2). Our decision affirming the appellant's conviction for operating a motor vehicle while drunk—Charge II, Specification 1—renders this AOE moot.

for a mistake of fact instruction; 9) the appellant's trial defense counsel was ineffective;[5] 10) the military judge abused his discretion when he denied the appellant's motion to challenge a member for cause;[6] and 11) the military judge abused his discretion in denying the appellant's request for a new Article 32, UCMJ, proceeding.[7]

Having carefully considered the appellant's assigned errors, the record of trial, the parties' submissions, and the oral arguments of counsel on AOEs 1 and 3, we conclude the findings and sentence are correct in law and fact and that no error materially prejudiced the appellant's substantial rights. Arts. 59(a) and 66(c), UCMJ; 10 U.S.C. §§ 859(a) and 866(c).

## I. BACKGROUND

The gravamen of the appellant's offenses stem from his encounters with three unrelated women on two different nights, separated by over two years.[8]

### A. Offenses Against GM

While stationed aboard USS TRUXTON (DDG 103) in September 2014, the appellant entered an electrical switchboard room late one night while the ship was underway and discovered Fireman Apprentice GM and Petty Officer Third Class RL undressed and in the throes of intimacy.[9] GM and RL immediately got dressed and as GM left the switchboard room, the appellant ordered her into a nearby classroom. GM testified that once she entered the classroom, the appellant followed her in and sat down in a chair, while she remained standing, and asked her who she was with and, referencing her liaison with RL, why she would "do that."[10] When GM told the appellant it made her feel close to RL and made her feel special, the appellant responded,

---

[5] Raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[6] Raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[7] Raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We have reviewed this AOE and find that it is without merit. *See United States v. Clifton*, 35 M.J. 79, 81 (C.M.A. 1992).

[8] The appellant's remaining conviction for drunken operation of a vehicle was unrelated to his interaction with any of the women.

[9] During cross-examination, GM denied that she and RL were actually having sex, but admitted to having had sex with RL on other occasions aboard the ship. *See* Record at 659-60. RL testified, however, that he and GM were having sex when the appellant walked in on them. *See* Record at 747.

[10] Record at 651.

"if you don't tell, I won't tell."[11] GM did not understand the appellant's statement and told him she was confused. According to GM, the appellant clarified, "if I don't tell[,] what's in it for me?"[12] GM testified at that point, she understood what the appellant was demanding. The appellant stood up, "grabbed his crotch and readjusted himself" and again said, "if you won't tell, I won't tell."[13]

GM testified that she felt like she did not have a choice and asked the appellant whether he had a condom. The appellant responded that he did not, but could get one. Before leaving the classroom to retrieve a condom, the appellant asked GM if he could "touch [her] butt" and she agreed because she "didn't want to get in trouble, and because [the appellant] had seen [her], and [she] didn't want [RL] to get in trouble either."[14]

After the appellant left the classroom, GM went to look for RL. GM testified that she did not know what to do and was looking for someone to help her. Unable to find RL or get in touch with anyone in RL's berthing compartment, GM eventually came across Petty Officer Third Class DR, who was on watch in one of TRUXTON's main engine rooms. DR testified that GM was crying and seemed worried when he first encountered her. He asked her what was wrong, and GM told him that the appellant "caught [her] having sex."[15] She explained to DR the appellant's proposition—"that he said if . . . she had sex with him then he wouldn't say anything"—and that she did not want to get RL in trouble.[16] GM asked DR to find RL in berthing and then returned to the classroom.

GM described the details of her sexual encounter with the appellant after she returned to the classroom. GM testified that she removed her coveralls, bent over a chair, closed her eyes, and the appellant penetrated her vagina with his penis from behind. She also described that she felt "stupid," "really scared," and like she "just wanted to die."[17]

After the appellant had finished, GM left the classroom and went back to the engine room to find DR to see if he was able to find RL and tell him what

---

[11] *Id.*

[12] *Id.*

[13] *Id.* at 651-52.

[14] *Id.* at 652.

[15] *Id.* at 675.

[16] *Id.* at 677.

[17] *Id.* at 654.

was happening. DR testified that when he saw GM again that night, she was still crying, but was more quiet than before. DR asked GM "if she did it" and GM nodded her head indicating that she had.[18] Meanwhile, the following day, the appellant asked another Sailor about the penalty for an officer having sex with an enlisted Sailor.

**B. Offenses Against MH and AM**

MH and AM were college students who attended the same college and lived in the same off-campus apartment complex in Hampton, Virginia. Despite attending the same college and living in the same apartment complex, they did not know each other.

On the night of 15 September 2016, MH fell asleep on her couch after watching a movie with a friend. MH's friend testified that when she left the apartment at around 0100 the next morning, she did not lock the door and that MH was still asleep on the couch with the lights and television on. Later that morning, MH awoke to a darkened apartment with a strange man sitting on her couch. MH testified about the exchange that followed with the intruder:

> He said, "Don't move, I have a gun." I said, "What do you want?" He said, "Take your pants off." I said, "I'm uninterested and I don't like men, like it's not happening." He said . . . "are you a girl?" I said, "Yeah." He said, "Well take your pants off I want [to] touch your butt." And I said, "I'm on my period you don't even want to touch me."[19]

After this exchange, MH noticed the man started "to creep and walk out of the house really slow."[20] She testified that as he walked towards the door, the man was masturbating. The man told her not to tell anyone, that he could get into a lot of trouble, that he knew people, and that if she told anyone, he would kill her. After the man opened the door to leave, light from outside the apartment provided enough illumination for her to see that the man was not wearing any pants—only boxer shorts—and he had his hand inside his boxer shorts masturbating. She was also able to get "a good look at his face, his height, posture, all of that."[21]

---

[18] *Id.* at 679. "She asked me if I had sex with anybody that I didn't want to have sex with, I told her no, and I asked her if she did it, she nodded."

[19] *Id.* at 396.

[20] *Id.*

[21] *Id.* at 398.

After the intruder left her apartment, MH woke her roommate and asked her if she had heard anything. Minutes later, at around 0330, MH called her mother. MH testified that she did not immediately call the police because the man had threatened her and she was not sure if he was still in the area. After talking with her mother, MH called the police who arrived at her apartment sometime before 0430. After providing information to the police, MH called another friend to come pick her and her friend up because they did not want to spend the rest of the night at the apartment. As the group drove away from the apartment, MH spotted the appellant on the street near her apartment complex. Although he was now fully dressed, MH recognized the appellant as the intruder based on his face, posture, height, and "droopy lip."[22] MH and her friends then flagged down a police officer who, shortly thereafter, arrested the appellant.

That same night—between the time the appellant left MH's apartment and the time he was arrested—the appellant was also inside another apartment in the same complex—AM's apartment.

AM and a couple of her friends were drinking vodka and playing games at her apartment. AM testified that she was very intoxicated by the end of the night. At about 0100, feeling sick, AM put on her nightgown and went to bed. Sometime after AM went to bed, her friends left and her roommate also went to bed—leaving AM and her roommate alone in the apartment. After going to bed, the next memory AM had was waking up naked with an unknown man wearing only boxer shorts and a t-shirt standing over her masturbating. AM thought "it was sort of like a dream" and described "blacking in and out."[23] AM testified that the man then moved towards the end of her bed and began "licking on [her] vagina."[24]

AM grabbed a nearby blanket, wrapped it around herself and asked the intruder what he was doing there. The man responded that they had met at a club. Confused, AM asked him for his name and at which club they had met. She also asked him where his pants were. The intruder responded that his pants were in his car—but did not tell AM his name or the name of the club where they had supposedly met. AM told the man that he had to go. Before he left, the man asked AM for her phone number. In an attempt to deescalate the situation yet not provide the intruder her own number, AM gave the man her sister's phone number because her sister lived several hours away in Philadelphia.

---

[22] *Id.* at 403.

[23] *Id.* at 495.

[24] *Id.* at 496.

After the intruder left the apartment, AM attempted to wake her intoxicated roommate. Unsuccessful in rousing her roommate, AM made a video call to her sister in Philadelphia at around 0445. AM relayed to her sister what had just happened to her, and went back to sleep. The next morning, AM and her roommate noticed that their patio door—a door they could not open—had been opened. Realizing that she had not been dreaming and that someone really had been in their apartment, AM contacted the authorities and ultimately submitted to a sexual assault forensic examination. Subsequent forensic analysis of swabs taken from AM during that examination revealed the presence of the appellant's DNA.[25]

Additional facts necessary to resolve the assigned errors are included below.

## II. DISCUSSION

### A. The Member Panel

#### 1. Equal protection

The appellant, an African-American man, contends that the CA removed all minority representation from his court-martial panel, thereby violating his Due Process and Equal Protection rights as expressed in *Batson v. Kentucky*, 476 U.S. 79 (1986).

##### a. The member selection process

On 4 January 2017, the CA, Rear Admiral (RADM) Scorby, Commander, Navy Region Mid-Atlantic, convened a general court-martial composed of ten officer members. On 6 April 2017, four days prior to the beginning of the appellant's trial, Captain (CAPT) Moore, while serving as the Acting-Commander, Navy Region Mid-Atlantic and CA for the appellant's court-martial, amended the previous convening order by removing the ten members selected by RADM Scorby, and appointing eight new members. On 10 April 2017, the day trial began, RADM Scorby—having resumed his duties as the CA for the appellant's court-martial—again amended the convening order by adding an additional member. In total, the appellant's court-martial panel consisted of nine members—eight appointed by CAPT Moore and one appointed by RADM Scorby.

---

[25] *See* Record at 624 ("the DNA mixture from inside [the] crotch of [AM's] underwear is 66 trillion times more likely to have come from [AM] and [the appellant] than if it came from [AM] and an unknown individual").

Prior to *voir dire*, the appellant's trial defense counsel (TDC) made an oral motion challenging the makeup of the court-martial panel, noting that there was an absence of minority members, and claiming this absence evidenced a "systematic exclusion of members based on race and gender."[26] In denying the motion, the military judge concluded that simply based on the "bare makeup of the panel" there was no "evidence that there [was] . . . a systematic, purposeful exclusion of any minority members [by the CA]."[27] The military judge did, however, offer the TDC an opportunity to present additional evidence to demonstrate that the CA had engaged in a pattern of exclusion of minority members. The TDC responded, however, that they would "stand on our motion as it is."[28]

Later in an Article 39(a), UCMJ, session during individual *voir dire*, the TDC renewed his motion, arguing that the CA had, in fact, engaged in a pattern of empaneling only white male members in courts-martial for African-American defendants. In support of his motion, the TDC noted that the members' questionnaires submitted to the CA contained questions asking the members their race and gender and offered a portion of a trial transcript from a previous court-martial—purportedly convened by the same CA—wherein the TDC in that court-martial also complained that there was no racial diversity (no African-Americans) on the panel.[29] After considering this evidence, the military judge maintained his previous ruling, concluding, "I don't see any unlawful Article 25[, UCMJ] issue here . . . there is no evidence [the CA is] not using the Article 25[, UCMJ] criteria . . . . I still don't see the systematic exclusion of [eligible members based on race or gender]."[30]

On appeal, the appellant submitted an affidavit from the Executive Officer (XO), Defense Service Office (DSO) Southeast.[31] In his affidavit, the XO asserts that RADM Scorby convened two other courts-martial besides the appellant's, where the accused was an African-American male and was convict-

---

[26] *Id.* at 171.

[27] *Id.* at 172.

[28] *Id.* at 174.

[29] *See* Appellate Exhibit (AE) XXXVIII. "[MJ:] I'm going to take it on good faith this is a Norfolk case that you are bringing to me. I do recognize the person's name here as a Norfolk trial counsel. I do note that the military judge in this case says, 'I've been here about a year and half.' So I think I know who the military judge is too based upon this." Record at 276.

[30] Record at 277.

[31] Appellant's Brief of 5 March 2018 at Appendix C; Affidavit of CDR CC of 27 Feb 18.

ed by panels made up of only white members. With the affidavit, the XO also enclosed a letter he sent to RADM Scorby complaining about the lack of minority representation on member panels for African-American defendants. Thereafter, according to the XO's affidavit, RADM Scorby twice amended an existing convening order in the case of an African-American officer represented by the XO, in order to include minority members. That officer, according to the affidavit, was eventually acquitted.

### b. Analysis

In *Batson*, the Supreme Court held that a criminal defendant who was a member of a "cognizable racial group" could establish a *prima facie* case of purposeful discrimination in the selection of a jury *based solely* on the prosecution's use of peremptory challenges for jurors who are part of the same racial group. 476 U.S. at 96 (emphasis added). Once this *prima facie* showing is made, the government must "come forward with a neutral explanation for challenging" those jurors. *Id. a*t 97. Our superior court applied *Batson* to the military in *United States v. Santiago-Davila*, 26 M.J. 380 (C.M.A. 1988).[32] The Court of Appeals for the Armed Forces (CAAF) noted that *Batson* was based on an equal-protection right to be tried by a jury from which no cognizable racial group had been excluded. *Id.* at 390. "This right to equal protection is a part of due process under the Fifth Amendment, and . . . it applies to courts-martial." *Id.* (citations omitted).

But *Batson* and *Santiago-Davila* deal with a prosecutor's use of peremptory challenges and not with the exclusion of minority members from the court-martial venire selected by a convening authority. The appellant argues, however, that the *per se* rule established in *Batson* and *Santiago-Davila* also applies to a CA's selection of members; that the mere absence of minority or female members within the venire selected by the CA, like a prosecutor's use of a peremptory challenge against a minority member, establishes a *prima facie* case of purposeful discrimination which then shifts the burden to the government to provide a race- or gender-neutral explanation for the exclusion of those minority members.

We recently declined to extend *Batson* to the CA's selection of members, as the appellant urges us to do here. *See United States v. Bess,* No. 201300311, 2018 CCA LEXIS 476, at *23-24 (N-M. Ct. Crim. App. 4 Oct 2018) (unpub. op.) (holding there was no precedent for the application of *Batson* to a

---

[32] The rule established in *Batson* applies to the striking of female members, regardless of the gender of the accused. *See United States v. Ruiz*, 49 M.J. 340, 343 (C.A.A.F. 1998) ("[I]t is irrelevant whether the accused and the person challenged are of the same gender").

CA's member selection).[33] As we pointed out in *Bess*, "we are bound by precedent that establishes that, absent further evidence of some intentional exclusion of a particular group by the CA, the absence of African-Americans on the panel does not constitute *prima facie* evidence of systematic exclusion." *Id.* at *24 (citing *United States v. Loving*, 41 M.J. 213, 285 (C.A.A.F. 1994)).

Our conclusion that *Batson's per se* rule does not apply to the CA's selection of members does not, however, end our inquiry. We must still determine whether the appellant has otherwise made a *prima facie* showing—through submission of the XO's affidavit—that the CA systematically excluded minority members. Indeed, "[a]s a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel." *United States v. Downing*, 56 M.J. 419, 421 (C.A.A.F. 2002) (internal quotation omitted). These rights are upheld through application of, *inter alia*, the Article 25, UCMJ, selection criteria. *United States v. Gooch*, 69 M.J. 353, 357 (C.A.A.F. 2011). Thus, we review whether a court-martial venire was selected free from systematic exclusion *de novo*. *United States v. Kirkland*, 53 M.J. 22, 24 (C.A.A.F. 2000) (citations omitted).

Our *de novo* review begins with a look at the authority and responsibility of the CA. "Actual appointment of fair and impartial members is the duty and responsibility of the CA." *United States v. Dowty*, 60 M.J. 163, 169 (C.A.A.F. 2004). A CA's "power to appoint a court-martial is one accompanying the position of command and may not be delegated." *United States v. Ryan*, 5 M.J. 97, 100 (C.M.A. 1978). In performing this non-delegable role, the CA is guided by Article 25(d)(2), UCMJ, which provides:

> [T]he convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament.[34]

"Simply stated, [Article 25] mandates the selection of members who are best qualified." *Dowty*, 60 M.J. at 169.

Turning now to the appellant's claim, a *prima facie* case of systematic exclusion in violation of the Equal Protection Clause is established through three factors. First, the discriminated group must be one "that is a recognizable, distinct class, singled out for different treatment under the laws, as writ-

---

[33] *Bess* was one of the cases cited in the XO's affidavit as one of the two other cases convened by RADM Scorby where an African-American accused was convicted by a panel lacking any African-American members. Affidavit of CDR CC at 2.

[34] Article 25(d)(2), UCMJ; 10 U.S.C. § 825(d)(2).

ten or as applied." *United States v. Loving*, 41 M.J. 213, 285 (C.A.A.F. 1993) (quoting *Castaneda v. Partida*, 430 U.S. 482, 494 (1977)). Next, "the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as [jurors], over a significant period of time." *Id.* (alteration in original). "Finally . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing." *Id.*

The appellant meets the first factor because he is a member of a recognizable class—he is African-American. At trial, the TDC noted on the record that none of the members appeared to be African-American. However, the appellant fails to meet his burden of proof under the second factor; that is, he fails to establish that African-Americans and women have been underrepresented by this CA over a significant period of time.[35] As the CAAF noted in *Loving,* underrepresentation on a single court-martial panel does not establish *systematic* exclusion. *Loving*, 41 M.J. at 285. The appellant here has shown little more. The only evidence beyond the bare makeup of the appellant's court-martial panel is an affidavit submitted by the XO of a defense service office command. Notably, the affidavit claims only that the CA convened two other courts-martial panels that did not include African-Americans. He does not claim that those panels did not have female representation. We do not find this constitutes underrepresentation "over a significant period of time." *Castaneda*, 430 U.S. at 494. In *Castenada*, the Supreme Court found *prima facie* evidence of systematic exclusion of Mexican-Americans from a Texas grand jury selection process where the county population was 79.1% Mexican-American, but only 39% of grand jury members *over an 11-year period* were Mexican-Americans. *See id.* at 495-96.

Here, the appellant has presented no evidence concerning the racial or gender demographics of the prospective member pool. *See Loving*, 43 M.J. at 285 ("When a Fifth Amendment . . . violation is asserted, statistics may be used to prove discriminatory intent.") (citation omitted). Nor has he made any attempt to identify how many African-American and female officers within the prospective member pool were senior to the appellant and available to perform courts-martial duties. Finally, the appellant has provided no evidence regarding the number of courts-martial convened by this CA, the number of African-American accused at those courts-martial, or the number or percentage of African-Americans or women who did serve on courts-martial panels. In short, we are simply left with anecdotal evidence of three courts-martial panels—including the appellant's—that had no African-American

---

[35] *See* Record at 275. The cases referred to by the appellant all occurred within a three-month period.

members and *no evidence* of the number of females who were detailed to serve on these panels. Importantly, we note that the two other panels—according to the XO's affidavit—were selected by RADM Scorby, not by CAPT Moore, the CA who selected eight of the nine members of the appellant's panel.

Consequently, the appellant fails to demonstrate that African-Americans and women have been underrepresented in courts-martial panels convened by this CA, over a significant period of time.

Finally, the appellant's claim also fails *Loving's* third factor. The appellant has failed to show that the CA's selection process was susceptible to abuse or was not race- or gender-neutral in conjunction. The only evidence supporting this factor is that some of the members' questionnaires contained racial and gender identifiers.[36] This is not enough. The CAAF has stated that "[r]ace and gender identifiers are neutral; they are capable of being used for proper as well as improper reasons." *Id.* (citing *United States v. Green*, 37 M.J. 380, 384 (C.M.A. 1993)).

Having found that the appellant has failed to establish either an underrepresentation of African-American or female members over a significant period of time, or a selection process susceptible to abuse, we conclude the appellant has not made a *prima facie* showing of systematic exclusion of African-Americans or women.

*2. UCI*

The appellant next contends that the CA exerted actual or apparent UCI by empaneling only white, male members to the appellant's court-martial.

The government is prohibited from assigning members to, or excluding members from, a court-martial panel in order to "achieve a particular result[.]" *United States v. Riesbeck*, 77 M.J. 154, 165 (C.A.A.F. 2018) (internal quotation marks and citation omitted). This "court stacking" is a form of UCI where the motive is to "affect the findings or sentence by including or excluding classes of individuals on bases other than those prescribed by" Article 25, UCMJ. *Id.* To prove UCI on appeal the appellant must show (1) facts, that if true, constitute UCI, (2) the prior proceedings were unfair, and (3) the UCI "was the cause of the unfairness." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999) (citing *United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A. 1994)). The appellant must show facts that, if true, allege the members were selected on an impermissible basis to affect the result of the trial. *Riesbeck,*

---

[36] Of the eight members selected by CAPT MM, only six had race as an identifying question on the members' questionnaire.

77 M.J. at 159. Proximate causation between the alleged UCI and court-martial outcome must be proven. *Biagase*, 50 M.J. at 150 (citing *United States v. Reynolds*, 40 M.J. 198, 202 (C.M.A. 1994)).

We review allegations of UCI *de novo*. *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citing *United States v. Harvey*, 64 M.J. 13, 19 (C.A.A.F. 2006)). The appellant alleges that the CA used race and gender to select an all-white, all-male panel in order to engage in court stacking. "The initial burden of showing potential [UCI] is low, but is more than mere allegation or speculation." *Id.* (citing *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 1999)). If the defense presents some evidence of UCI, the burden shifts to the government to show either that there was no UCI, or that any UCI did not taint the proceedings. *Stoneman,* 57 M.J. at 41.

We find that the appellant has not met his initial burden. Only seven of the nine members' questionnaires contained any racial or ethnicity identifying question and response, and there is no evidence that the CA knew the race of the other two members detailed to the court-martial. None of the members listed Navy Region Mid-Atlantic as their parent command on their member questionnaires, and thus we have no reason to suspect that the CA—either RADM Scorby or CAPT Moore—personally knew any of the members.

In *United States v. Lewis,* 46 M.J. 338, 342 (C.A.A.F. 1997), our superior court held that the appellant "failed to produce sufficient evidence to raise the issue of court stacking" despite finding that five women detailed to a court-martial panel "was an anomaly." The court held that "no one could show a pattern of court stacking or improper actions or motives on the part of the [g]overnment." *Id.* (citing *Loving*, 41 M.J. at 285). More recently, however, the CAAF found UCI after a series of CAs in the same case selected a member panel consisting of five women—four of whom were victim advocates—and two men, for an accused charged with rape and sexual assault. *Riesbeck*, 77 M.J. at 158. In *Riesbeck*, the CAAF clarified that the improper member selection was not "supported by a statistical anomaly alone." *Id.* at 164. In contrast to *Lewis,* the CAAF explained that the record in *Riesbeck* was:

> [R]eplete with evidence that the inclusion of a high percentage of women was the result of intentional choices by the first three convening authorities, and the apparently untutored acquiescence of the fourth. It is the *evidence that an improper selection criterion was actually used that raises the court stacking issue.*

*Id.* (emphasis added).

The appellant's case is similar to *Lewis* and distinguishable from *Riesbeck*. First, as in *Lewis*, the appellant has presented "no evidence that an

improper selection criteria was used to create [an] anomalous panel." *Id.* Indeed, the appellant's claim here is even more speculative than that in *Lewis.* The appellant has failed to even demonstrate his panel was "anomalous" because he has failed to provide evidence concerning the racial or gender makeup of the prospective member pool. Second, unlike *Riesbeck*, there is no evidence that any improper selection criteria were actually used in selecting the members. As in our previous decision in *Bess,* we have considered the affidavit provided by the TDC's XO; just as we did in *Bess,* "we find that this anecdotal observation by the [XO] of a defense command, which cuts both in favor of and against the appellant's allegation of CA bias" does not provide evidence of improper selection criteria. *Bess*, 2018 CCA LEXIS at \*26. Moreover, the appellant's case is different from those cases cited in his brief and in the XO's affidavit: eight of the nine members were selected by CAPT Moore while he was serving as the CA. This fact significantly undercuts the appellant's argument that "[i]n less than a year, Rear Admiral Scorby convened at least three courts-martial with a minority accused and an all-white panel."[37] As a result, we conclude that the appellant has not met his burden to establish some evidence of potential UCI.

In addition to considering the case for actual UCI, we have considered apparent UCI, asking whether "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Salyer*, 72 M.J. at 423 (citing *Lewis*, 63 M.J. at 415). We find that the facts in the record would not lead a reasonable person to harbor significant doubt about the fairness of the proceeding. The appellant presented no evidence that the CA selected members by using any criteria other than those found in Article 25, UCMJ.

### B. Military Rule of Evidence 404(b)

The appellant next contends that the military judge erred by instructing the members that they could use evidence from the charged allegations against GM, MH, and AM to prove the appellant's motive and intent with respect to other charged misconduct, under MILITARY RULE OF EVIDENCE (MIL. R. EVID. 404(b), MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2016 ed.).

The appellant's argument is two-fold. First, the appellant argues that our superior court's decision in *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016), which barred the admission of evidence relevant to one charged offense to show the appellant's propensity, under MIL. R. EVID. 413, to commit an-

---

[37] Appellant's Brief at 33.

other charged offense, is equally applicable to evidence of motive and intent admitted pursuant to MIL. R. EVID. 404(b). Second, the appellant avers that even if *Hills* does not apply to evidence of motive and intent, the military judge nonetheless erred in assessing the material relevance, probative value, and prejudicial effect of the evidence.

We address each of the appellant's concerns, in turn.

*1. Applicability of* Hills

In *Hills*, the CAAF unequivocally held that evidence of one charged offense may not be admitted as propensity evidence, pursuant to MIL. R. EVID. 413, to prove the accused has committed other charged offenses. *Id.* at 356 ("It is antithetical to the presumption of innocence to suggest that conduct of which an accused is presumed innocent may be used to show a propensity to have committed other conduct of which he is presumed innocent."). The court distinguished charged misconduct from prior sexual assault convictions and uncharged sexual offenses, which remain admissible under MIL. R. EVID. 413. *Id.* at 354. But using MIL. R. EVID. 413, a "rule of admissibility for evidence that would otherwise not be admissible," to admit evidence already before the fact finder as proof of charged offenses was an abuse of discretion. *Id.* at 352. The appellant contends that the CAAF's rationale in *Hills* applies equally to evidence of motive and intent admitted pursuant to MIL. R. EVID. 404(b). We disagree.

We first note the obvious—*Hills* and its progeny deal with *propensity* evidence admitted under MIL. R. EVID. 413 and 414 and not with evidence of motive, opportunity, intent, etc., admitted under MIL. R. EVID. 404(b). *See also United States v. Williams,* 77 M.J. 459 (C.A.A.F. 2018); *United States v. Guardado,* 77 M.J. 90 (C.A.A.F. 2017); *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017). Evidence admitted under MIL. R. EVID. 404(b), is not propensity evidence because it "is not admissible to prove the character of a person in order to show action in conformity therewith." MIL. R. EVID. 404(b).

Further, the CAAF observed that neither their court nor any federal circuit court of appeals has permitted the use of MIL. R. EVID. 413, or its federal counterpart, "as a mechanism for admitting evidence of charged conduct to which an accused has pleaded not guilty in order to show a propensity to commit the very same charged conduct." *Hills*, 75 M.J. at 354. The same cannot be said about the use of charged conduct to show an accused's motive and intent to commit other charged misconduct under MIL. R. EVID. 404(b). As early as 1984, our superior court recognized that evidence related to one charged offense may be admitted to prove motive or intent for another charged offense. In *United States v. Cox*, 18 M.J. 72 (C.M.A. 1984), the Court of Military Appeals (CMA) affirmed that appellant's conviction after he chal-

lenged a military judge's instruction given in response to a member's question. The member asked whether he could use his belief that the accused had "a pattern of lustful intent"—established in several charged specifications—as circumstantial evidence in another specification. *Id.* at 74. According to the appellant, the military judge's vague answer provided "no answer at all and . . . implied that it was permissible for the members to take intent from December and transfer it to the following November." *Id.* at 75. The CMA held that the military judge's instruction was correct, but that a shorter, "equally correct" answer "would have been simply, 'Yes! Evidence of other crimes, wrongs, and even acts are specifically admissible to prove . . . intent." *Id.* (citing MIL. R. EVID. 404(b)).

The CAAF was even more explicit in *United States v. Tanksley,* 54 M.J. 169 (C.A.A.F. 2000), *overruled on other grounds by United States v. Inong*, 58 M.J. 460, 464 (C.A.A.F. 2003). Captain Tanksley was charged with committing indecent acts with his minor daughter while giving her a bath. He was also charged with making a false official statement after denying that he had, years earlier, abused his older daughter. The government sought to introduce evidence of the older daughter's abuse not only to prove the false official statement, but also as evidence of intent that Captain Tanksley abused his younger daughter. The military judge admitted the evidence, pursuant to MIL. R. EVID. 404(b), to show Captain Tanksley's intent to arouse or gratify his sexual desire while bathing his younger daughter. The CAAF affirmed, observing that MIL. R. EVID. 404(b) "does not say whether the other crimes, wrongs, or acts must be charged or uncharged conduct." *Tanksley*, 54 M.J. at 175 (internal quotation marks omitted). Rather, "[t]he nub of the matter is whether the evidence is offered for a purpose other than to show an accused's predisposition to commit an offense." *Id.*

Given this precedent from our superior court, and the plain reading of *Hills*, we conclude that *Hills* does not apply to evidence admitted pursuant to MIL. R. EVID. 404(b). Indeed, the CAAF noted that the issue in *Hills* had "no bearing on [the court's] jurisprudence with respect to . . . the use of multiple offenses with similar facts to argue identity, absence of mistake, modus operandi, etc." *Hills*, 75 M.J. at 357 n.4.

We next examine whether the military judge abused his discretion in admitting evidence of motive and intent in this case.

### 2. *Evidence of motive and intent*

The military judge made two distinct rulings that are at issue on appeal. First, he ruled that evidence the appellant masturbated in front of AM and MH, touched his crotch in front of GM, and that he asked to touch the buttocks of both GM and MH, could be considered to prove the appellant's *intent*

to gratify his sexual desires for the sexual assault of AM, the burglary of both AM and MH's apartments, and the extortion of GM.[38] Second, the military judge ruled that evidence the appellant entered both MH's and AM's apartments without their knowledge or permission, and evidence that the appellant threatened both MH and GM while requesting that each engage in sexual acts with him, could be considered "to prove the motive of the [appellant] to use situations of power against women to intentionally satisfy his sexual desires."[39] Specifically, the military judge admitted this evidence to prove the appellant's *motive* for the sexual assaults of AM and GM, the extortion of GM, and the burglaries of AM and MH's apartments.

### a. The *Reynolds* test

The military judge applied the three-prong test for determining admissibility of MIL. R. EVID. 404(b) evidence announced in *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989): (1) the evidence must reasonably support a finding that the appellant committed the prior crimes, wrongs, or acts; (2) the evidence must make a fact of consequence more or less probable; and (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice. This third prong employs the traditional MIL. R. EVID. 403 balancing test. *United States v. Hays*, 62 M.J. 158, 164 (C.A.A.F. 2005). Although *Reynolds* dealt with the admissibility of *uncharged* misconduct, in *Tanksley* the CAAF applied *Reynolds* when the government sought to use evidence of charged misconduct to prove intent for another charged offense. *Tanksley*, 54 M.J. at 176 ("While this is not a pure uncharged misconduct case . . . we will apply the three-prong test . . . announced in *United States v. Reynolds*."). Therefore, we conclude the military judge used the correct test to assess the admissibility of motive and intent evidence in this case.

While the appellant couches his assigned error as instructional and urges our *de novo* review, the appellant actually attacks the military judge's underlying evidentiary ruling permitting the members to use evidence of charged offenses to show the appellant's motive and intent for other charged offenses. Because the military judge's MIL. R. EVID. 404(b) evidentiary ruling is the issue, we review for an abuse of discretion. *Tanksley*, 54 M.J. at 175; *United States v. Harcrow*, 65 M.J. 190, 201-02 (C.A.A.F. 2007). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion." *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (citation and

---

[38] Record at 864; *see also* AE XXXV at 13-16. The appellant was acquitted of the burglary of AM's apartment.

[39] Record at 865; *see also* AE XXXV at 13-16.

internal quotation marks omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citations omitted).

Finally, we recognize that MIL. R. EVID. 404(b) "is a rule of inclusion rather than exclusion" and "permits admission of relevant evidence of other crimes or acts unless the evidence tends to prove only criminal disposition." *United States v. Browning*, 54 M.J. 1, 6 (C.A.A.F. 2000) (internal citations and quotation marks omitted). The question is "whether the evidence of the misconduct is offered for some purpose other than to demonstrate the accused's predisposition to crime and thereby to suggest that the factfinder infer that he is guilty, as charged, because he is predisposed to commit similar offenses." *Tanksley*, 54 M.J. at 175 (internal quotation marks and citations omitted).

We agree with the military judge's ruling on the first *Reynolds* prong. We find sufficient evidence in the record such that a reasonable factfinder could find by a preponderance of evidence that the appellant engaged in or attempted the specific acts in question.

As to the second *Reynolds* prong, we conclude that the military judge did not abuse his discretion. The witnesses testified that the appellant masturbated or grabbed his crotch in their presence and asked to touch them. This evidence tends to make the fact that the appellant intended to gratify his sexual desires more probable. The appellant argues, however, that evidence of intent was not materially relevant at trial, because "the contested facts did not raise the issue of intent."[40] The appellant points out that he challenged AM's allegations based on consent, or his mistake of fact as to that consent; that he challenged MH's allegations based on mistaken identity; and that GM's allegations are merely a fabrication, concocted to avoid getting in trouble for her own misconduct. We disagree with this argument. "A simple plea of not guilty . . . puts the prosecution to its proof as to all elements of the crime charged." *Mathews v. United States*, 485 U.S. 58, 64-65 (1988). The CAAF reiterated this point, explaining that the Supreme Court had "unequivocally determined that evidence of intent . . . may be admitted regardless of whether a defendant argues lack of intent because every element of a crime must be proven by the prosecution." *United States v. Harrow*, 65 M.J. 190,

---

[40] Appellant's Brief at 44.

202 (C.A.A.F. 2007) (citing *Estelle v. McGuire*, 502 U.S. 62, 69 (1991)); *Mathews*, 485 U.S. at 64-65.

Here, the military judge specifically limited consideration of the intent evidence to those crimes where intent was an element. The specifications alleging that the appellant sexually assaulted AM both required the government to prove that the appellant penetrated AM's vagina with his tongue with the intent "to arouse or gratify the sexual desire of any person."[41] Likewise, in order to prove burglary, the government was required to prove, *inter alia*, that the appellant entered MH's apartment without her permission to commit abusive sexual contact therein. Abusive sexual contact, in turn, requires an "intent to gratify the sexual desires of any person."[42] Finally, the extortion of GM, as charged, required the government to prove that the appellant intended to threaten GM in order to obtain sexual relations. Therefore, the military judge did not abuse his discretion in admitting evidence of the appellant's intent.

Regarding the evidence admitted to show the appellant's motive to "use situations of power against women to intentionally gratify his sexual desire," the military judge found that "[b]reaking into homes presents the occupants with an incredibly frightening situation" where the intruder has a "powerful upper-hand in satisfying whatever motives . . . he may have."[43] Similarly, the military judge concluded that the appellant had power over GM because of his authority as an officer and because he had witnessed her committing misconduct that he was obligated to report under Navy Regulations and could result in disciplinary action against GM. The appellant argues that the "motive" crafted by the military judge is simply a euphemism for predisposition. Again, we disagree. The military judge noted that in each interaction with his victims, the appellant held some form of power; that he either masturbated or touched himself in each instance; that two of the three incidents occurred on the same night, in the same apartment complex under very similar circumstances; and that the appellant threatened two of his three victims. Based on these facts, the military judge found a "pattern of behavior."[44] The appellant points to no clearly erroneous finding of fact and does not claim that the military judge applied the wrong legal test or otherwise ignored binding law. Moreover, as in *Tanksley*, the military judge's "carefully tailored instructions to a senior panel of officers ensured that the evidence would not be used by

---

[41] Article 120(g)(1)(B), UCMJ; 10 U.S.C. § 920(g)(1)(B).

[42] *Id.* at 855; *see also* Article 120(g)(2)(A)-(B), UCMJ; 10 U.S.C. § 920(g)(2)(A)-(B).

[43] AE XXXV at 15.

[44] *Id.*

the factfinders for other than the purpose for which it was admitted." *Tanksley*, 54 M.J. at 176 (citations omitted). Consequently, we find no clear abuse of discretion.

As to the third *Reynolds* prong, the military judge properly applied the MIL. R. EVID. 403 balancing test. A military judge enjoys wide discretion in applying MIL. R. EVID. 403 and we exercise great restraint in reviewing a judge's decisions under the rule. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citations omitted). Since the military judge in this case conducted and announced his balancing test on the record, "we will not overturn his decision unless there is a clear abuse of discretion." *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010) (internal quotation marks and citation omitted).

The evidence of the appellant's other crimes, wrongs, or acts was already before the members as this evidence formed the basis of other charges. The military judge's instructions regarding the use of each particular piece of evidence made clear for the members that the evidence could only be used for its tendency, *if any*, to show the appellant's motive or intent for other specific charged offenses. Therefore, the danger of unfair prejudice was low. Consequently, we find no clear abuse of discretion with the military judge's admission of evidence of charged misconduct to prove motive and intent regarding other charged misconduct.

b. Prejudice

Although we find that the military judge did not abuse his discretion, we conclude that even if there was error, any such error was harmless. When there is error in the admission of evidence under MIL. R. EVID. 404(b), we must then determine whether the error resulted in material prejudice to the appellant's substantial rights. *United States v. Barnett*, 63 M.J. 388, 397 (C.A.A.F. 2006) (citing Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2000)). "We evaluate prejudice from an erroneous evidentiary ruling by weighing (1) the strength of the [g]overnment's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *Id.* (citations omitted).

Here, the government's case was strong. Both AM and MH testified that they woke up the same night, hours apart, to find a strange man, wearing no pants and no shoes, masturbating in their respective apartments. AM testified that the man sexually assaulted her by penetrating her vulva with his tongue. Forensic analysis of DNA discovered on AM and her clothes confirmed that the man in her apartment was the appellant.

MH testified that her intruder propositioned her, threatened her, then left when she rebuffed him. She was able to get a good look at the intruder's

facial characteristics and stature as he was leaving her apartment. She then recognized that intruder as the appellant when she saw him a short while later standing on the side of the road near her apartment complex.

With regard to GM, she made contemporaneous reports to DR about the appellant's *quid pro quo* proposition the very night it happened. DR testified that GM was upset and crying and later admitted to having sex with the appellant. RL testified and confirmed that the appellant caught him with GM in the switchboard room. A fourth Sailor testified that the appellant asked him the day following the assault about the penalty for an officer having sex with an enlisted Sailor.

In contrast, the defense's case was weak. The appellant's theory was that AM was so drunk that she forgot she had a consensual relationship with him. AM testified that the appellant told her they had met at a club earlier in the evening. Yet AM knew she had stayed at her apartment drinking with friends all night until she fell asleep. When the appellant texted AM's sister the next day—believing he was communicating with AM—he told her that they had met a year ago "but [she] probably forgot."[45] In his texts to AM's sister, however, the appellant made no mention of the previous night's encounter even after the woman he thought was AM did not seem to know who he was. This behavior belies the appellant's assertion that the encounter with AM was consensual.

The appellant argued that MH misidentified him, pointing out that MH told 911 operators that her assailant was wearing a different colored shirt than the appellant was wearing when he was arrested. Yet, she was able to clearly identify the appellant—by his stature and his facial characteristics—when she saw him near her apartment complex in the early morning hours following the burglary of her home. The sheer coincidence that MH would find a man matching her intruder's unmistakable physical features near her apartment complex shortly after her home had been burglarized makes the appellant's mistaken identity theory implausible.

Finally, the defense argued that GM simply made up her claims to avoid her own legal troubles, and that the other corroborating testimony was a conspiracy. In support of this claim, the appellant's friend—a former naval officer—testified that the appellant told him he was on a roving watch when he entered the switchboard room and found GM and RL together, and that before he could turn them in, GM made the allegations against him. However, this testimony was contradicted by the TRUXTON's Executive Officer, who testified that no officers onboard the ship conducted any roving watches.

---

[45] Prosecution Exhibit (PE) 9 at 1.

Regarding the materiality and quality of the evidence in question, we recognize that "[a]n error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant." *United States v. Barker*, 77 M.J. 377, 384 (C.A.A.F. 2018) (citing *Harrow*, 65 M.J. at 200). Here, even without the MIL. R. EVID. 404(b) ruling and subsequent instruction, all of the government's evidence would have been admissible. As a result, the military judge's ruling provided no new ammunition against the appellant. Likewise, the government's argument to the members would have remained the same. In sum, even if it was error to allow the evidence to be used as MIL. R. EVID. 404(b) evidence of motive and intent, we do not believe the use of the evidence as MIL. R. EVID. 404(b) evidence had a "substantial influence on the findings" and therefore, we conclude there was no material prejudice to the appellant's substantial rights. *United States v. Yammine*, 69 M.J. 70, 79 (C.A.A.F. 2010) (internal quotation marks and citation omitted).

**C. Legal and Factual Sufficiency**

The appellant contends that his convictions for sexually assaulting AM and GM are legally and factually insufficient. We review questions of legal and factual sufficiency *de novo*. Art 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is whether "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant's guilt beyond a reasonable doubt." *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (citation, internal quotation marks, and emphasis omitted). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a reasonable doubt does not mean, however, that the evidence must be free from conflict. *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001). "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297-98, (C.A.A.F. 2018) (quoting *Rosario*, 76 M.J. at 117).

*1. Sexual assault of AM*

As we discussed above, the case against the appellant was strong, and was especially strong regarding the sexual assault of AM. AM's testimony that the appellant penetrated her vulva with his tongue was corroborated by

the DNA evidence. Indeed, the appellant does not contest the underlying sexual act, but avers that the government failed to prove beyond a reasonable doubt that AM did not consent to the sexual act. The appellant argues that AM had significant gaps in her memory that the government sought to fill with "a narrative that [the appellant] broke into [AM's] home."[46] The appellant's actions, he argues, demonstrate that he and AM knew each other: he stopped performing oral sex on AM after she asked him to stop; he offered to leave, if she wanted him to leave, and then let himself out; he asked AM for her phone number and she gave him a number before he left, and then he texted that number the next day hoping to communicate with AM. We disagree.

AM may have been intoxicated and confused, but her behavior did not demonstrate consent. AM testified that she had never met the appellant and that she did not know him; that after she felt the appellant licking her, she jumped up and asked what the appellant was doing in her bed. She then asked the appellant who he was, and he responded that they had met at a club. Yet AM knew she had stayed in her apartment the entire night. After the appellant left AM's apartment, she unsuccessfully tried to rouse her roommate and then immediately called her sister. When she awoke later that morning, she discovered her patio door had inexplicably been opened. Finally, when the appellant texted AM's sister the following day—believing it to be AM—he explained that they had met a year ago, and made no mention of being in her apartment the night before. Consequently, after carefully reviewing the record of trial and considering all of the evidence in a light most favorable to the prosecution, we are convinced that a rational factfinder could have found that AM did not consent. Furthermore, weighing all the evidence in the record and making allowances for not having personally observed the witnesses, we too are convinced beyond a reasonable doubt of the appellant's guilt.

*2. Sexual assault of GM*

The appellant next contends that his conviction for sexually assaulting GM was legally and factually insufficient because the government failed to prove that the appellant threatened GM. In order to convict the appellant of violating Article 120(b)(1)(A), UCMJ, the government was required to prove beyond a reasonable doubt that:

> (1) That the appellant committed a sexual act upon GM by penetrating her vulva with his penis; and

---

[46] Appellant's Brief at 64.

(2) That the appellant did so by threatening or placing GM in fear that if she did not engage in sexual intercourse with him he would report her for misconduct she committed while on the ship.[47]

To threaten or place someone in fear under the statute "a communication or action" must be "of sufficient consequence to cause a reasonable fear that non-compliance will result in the victim or another person being subjected to the *wrongful action* contemplated by the communication or action."[48]

The appellant first argues that his statement to GM, "if you don't tell, I won't tell," and his follow-up question, "if I don't tell, what's in it for me?" do not amount the threats.[49] Rather, he argues that after he caught GM having sex with RL on the ship, she proposed sex in order to avoid getting in trouble.[50] The appellant also points out that GM asked him whether he had a condom and recommended the classroom as a location for sex after the appellant queried her where they could go and not get caught. Again, we disagree.

In *United States v. Averell*, No. 201300471, 2014 CCA LEXIS 841 (N-M. Ct. Crim. App. 6 Nov 2014) (unpub. op.), we affirmed Chief Petty Officer (Chief) Averall's conviction for sexual assault under strikingly similar circumstances. In *Averall,* the victim had returned to her ship drunk, became profane in berthing, and had a heated exchange with another Sailor. The victim had been a marginal performer and had frequently been in trouble. Chief Averall had always acted as her "protector" and ensured she avoided punishment. *Id.* at *3. On this occasion, however, Chief Averall directed the victim to a secure space onboard the ship, told her she was "in trouble and she knew what she needed to do." *Id.* at *5 (internal citations and alterations omitted). The victim then acquiesced to sex, fearing that if she refused, her protector would no longer shield her from punishment. We held that a reasonable person would have been in fear of being subjected to Chief Averall's implied actions—engage in sexual relations or be held accountable for misconduct. So too here.

---

[47] 10 U.S.C. § 920(b)(1)(A); MCM, Part IV, ¶ 45.b(3)(a); Charge Sheet; Record at 850-51.

[48] Article 120(g)(7), UCMJ; 10 U.S.C. § 920(g)(7) (emphasis added).

[49] Record at 651.

[50] While not explicitly referenced at trial or on appeal, most ships have a command policy prohibiting sexual activity between Sailors while on board ship. Being caught violating such a policy could have resulted in disciplinary action against GM and RL.

An objective review of the appellant's statements and circumstances surrounding them lead a reasonable person to understand their meaning—that if GM did not accede to the appellant's wishes he would report her misconduct and she would face the consequences. GM was a 20-year-old E-2, newly reported to a deployed warship, who had just been caught having sex with another Sailor. The appellant, an officer and significant authority figure to GM, isolated GM in the classroom, asked her to identify her companion and then grabbed his crotch and adjusted his genitals while asking what was in it for him if he did not report her misconduct. Just as in *Averall*, a reasonable person would have been in fear of being subjected to the appellant's implied actions—engage in sexual relations or be held accountable for misconduct.

Next, the appellant argues that even if his communications and actions can be construed as a threat, he did not threaten *wrongful action* as the statute requires. The appellant avers that an officer reporting a Sailor for having committed misconduct is "a normal part of his duties" and, therefore, not a wrongful action.[51] Again, we disagree.

First, we recognize that "[t]he word wrongful, like the words willful, malicious, fraudulent, etc., when used in criminal statutes, implies a perverted evil mind in the doer of the act." *United States v. Thomas*, 65 M.J. 132, 134 (C.A.A.F. 2007) (citations and internal quotation marks omitted). To be sure, the *act* of reporting an enlisted Sailor for committing misconduct is not, in and of itself, wrongful. Rather, as the appellant suggests, it is a required duty of any member of the naval service, much less a commissioned officer. But here, the appellant's perverted intent behind telling GM that he would report her—a *quid pro quo* where he would overlook GM's offense and his reporting obligation in return for her complying with his implied sexual demands—transforms the statement from an otherwise lawful, righteous act into wrongful conduct.

Second, we take a broader view of the term *wrongful action* than that ascribed to it by the appellant. A brief history of the evolution of that term is illustrative.

The version of Article 120, UCMJ, charged here came into effect on 28 June 2012, following passage of the 2012 National Defense Authorization Act (2012 NDAA).[52] Prior to the 2012 NDAA, Article 120, UCMJ, had two separate definitions for the term *threatening or placing that other person in fear*. First, Article 120(t)(6), UCMJ, defined the term with respect to the offenses of *rape* and *aggravated sexual contact* and required that the "communication

---

[51] Appellant's Brief at 81 (citing U.S. NAVY REGULATIONS ¶ 1137 (1990)).

[52] 112 P.L. 81, 125 Stat. 1298, 1406-1407 (2012).

or action" be "of sufficient consequence to cause a reasonable fear that non-compliance [would] result in the victim or another being subjected to death, grievous bodily harm, or kidnapping." 10 U.S.C. § 920(t)(6) (2007). Article 120(t)(7), UCMJ, on the other hand, defined the term with respect to *aggravated sexual assault* and *abusive sexual contact* as follows:

(A) In general. The term "threatening or placing that other person in fear" . . . means a communication or action that is of sufficient consequence to cause a reasonable fear that non-compliance will result in the victim or another being subjected to a lesser degree of harm than death, grievous bodily harm, or kidnapping.

(B) Inclusions. Such lesser degree of harm includes—

(i) physical injury to another person or to another person's property; or

(ii) a threat—

(I) *to accuse any person of a crime*;

(II) to expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule; or

(III) through the use or abuse of military position, rank, or authority, to affect or threaten to affect, either positively or negatively, the military career of some person.

10 U.S.C. § 920(t)(7) (2007) (emphasis added).

In addition to making other sweeping changes to Article 120, UCMJ, the 2012 NDAA consolidated the definition of *threatening or placing that other person in fear* into a single provision—Article 120(g)(7), UCMJ. Gone from the new definition are references to "death, grievous bodily harm, or kidnapping" as well as "lesser degree[s] of harm" such as "physical injury to another person" or "a threat . . . to accuse any person of a crime." Yet, the crime of rape by threatening or placing another person in fear that any person will be subjected to death, grievous bodily harm, or kidnapping has remained virtually unchanged from its 2007 counterpart.[53] The clear import, then, of the 2012 changes was to simply consolidate two definitional sections into one, substituting the generic term "wrongful action" for "death, grievous bodily harm, or kidnapping" as well as all of the other lesser forms of harm defined

---

[53] *Compare* Article 120(a)(3), UCMJ (2012); 10 U.S.C. § 920(a)(3) (2012) *with* Article 120(a)(3), UCMJ (2007); 10 U.S.C. §920(a)(3) (2007).

in the former Article 120(t)(7), UCMJ—including the threat "to accuse any person of a crime." We therefore find that the appellant's threat to accuse GM of a crime or misconduct was a "wrongful action" as contemplated by the statute.

Accordingly, after carefully reviewing the record of trial and considering the evidence in the light most favorable to the government, we are convinced that a reasonable trier of fact could have found all the essential elements beyond a reasonable doubt. Further, after weighing all the evidence and having made allowances for not having personally observed the witnesses, we too are convinced beyond a reasonable doubt of the appellant's guilt.

### D. Mistake of Fact Instruction

The appellant avers that the military judge erred in denying his request for a mistake of fact as to consent instruction because he "presented evidence that [he] acted consistently with someone who was under the mistaken impression his actions with [AM] were consensual."[54]

Where a mistake of fact defense is reasonably raised by the evidence, an instruction on that defense is required. *United States v. Davis*, 76 M.J. 224, 228 (C.A.A.F. 2017) (citations omitted). Whether a mistake of fact instruction has been reasonably raised by evidence is a question of law we review *de novo. United States v. MacDonald*, 73 M.J. 426, 434 (C.A.A.F. 2014). "The test for determining whether an affirmative defense of mistake of fact has been raised is whether the record contains some evidence of an honest and reasonable mistake to which the members could have attached credit if they had so desired." *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003) (citing RULE FOR COURTS-MARTIAL (R.C.M.) 916(j), MCM (2002 ed.)).[55]

---

[54] Appellant's Brief at 66.

[55] Although the sexual assault alleged in Charge III, Specification 1 has a specific intent element—that the appellant intended to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person—because the mistake of fact asserted by appellant—that AM consented to his acts—did not go to an "element requiring premeditation, specific intent, willfulness, or knowledge of a particular fact," any mistake of fact, would have to have been both honest *and* reasonable under all the circumstances. R.C.M. 916(j)(1). *See United States v. DiPaola*, 67 M.J. 98, 101 (C.A.A.F. 2008) ("While an indecent assault offense includes a specific intent element as to whether the touching was committed to satisfy the lust or sexual desires of the accused, the lack of consent element of the offense is a general intent element"); *United States v. Peterson*, 47 M.J. 231, 234-35 (C.A.A.F. 1997) ("While indecent assault entails one element requiring specific intent (that is, that the offensive touching was committed to satisfy the lust or sexual desires of the accused), the consent element of consent in this offense is a general-intent element. Accordingly, a

The evidence at trial reflected that AM was drunk and was "blacking in and out" when the appellant appeared, uninvited, in her apartment in the middle of the night.[56] The appellant stood over her and masturbated. AM remembered the appellant moving towards her on the bed and then waking to him licking her vagina. AM testified that she had never met the appellant and had to ask him who he was and what he was doing there. AM testified that the appellant told her they had met at a club, but she had not gone out that night and had stayed at home with friends. Further, the morning after the assault, AM discovered her patio door had inexplicably been opened, yet neither she nor her roommate had previously been able to open it.

The appellant argues that because AM was blacking in and out, there remains the possibility that she invited the appellant into her apartment but simply does not remember doing so. The appellant's subsequent interactions with AM, he maintains, then provide some evidence of his honest and reasonable belief that AM consented to sexual activity. This argument is specious. There is no evidence whatsoever that AM invited the appellant into her apartment, only the appellant's self-serving conjecture. In sum, there was no reasonable explanation for how the appellant got into AM's apartment, and more importantly, no evidence that the appellant reasonably believed AM consented.

Regardless, even were we to assume the MJ erred in failing to provide the requested mistake of fact instruction, we conclude any such error was harmless. Where an instructional error raises constitutional implications, we test the error for prejudice using a "'harmless beyond a reasonable doubt' standard." *United States v. Davis*, 73 M.J. 268, 271 (C.A.A.F. 2014) (quoting *United States v. Wolford*, 62 M.J. 418, 420 (C.A.A.F. 2006)). The test for determining if the constitutional error is harmless is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Whether the error is harmless beyond a reasonable doubt is a question of law that we review *de novo*. *United States v. Simmons*, 59 M.J. 485, 489 (C.A.A.F. 2004).

The evidence supporting the appellant's conviction for sexually assaulting AM was overwhelming. Even with a mistake of fact instruction, the appellant's defense would have been that he reasonably believed AM was consenting to the sexual act, despite evidence that she had not gone out that night,

---

mistake-of-fact defense on this element would require both a subjective belief of consent and a belief that was reasonable under all the circumstances.")

[56] Record at 495.

had instead gotten drunk with her friends in her apartment, that she had never met the appellant, did not know him, and did not let him into her apartment. Indeed, as we discussed above, the appellant's assertions that he honestly and reasonably believed AM was consenting are contradicted by his text messages to AM the next day.[57] After the appellant texted AM and was queried about his identity, rather than simply reminding AM that they had been together—and had been intimate—just several hours earlier, the appellant explained that they met a year ago and that she probably did not remember him. These texts demonstrate the appellant's consciousness of guilt. In short, even if there was *some evidence* of the appellant's honest and reasonable belief that AM consented, we are convinced beyond reasonable doubt that providing the mistake of fact instruction to the members would have done nothing to counter the overwhelming evidence of the appellant's guilt. Therefore, informed by the evidence adduced at trial, it is clear beyond a reasonable doubt that any error did not contribute to the verdict.

### E. Ineffective Assistance of Counsel

The appellant next claims that his TDC was ineffective. First, the appellant contends that his TDC should have requested TRUXTON's bridge deck log to show that he was on watch at the time GM claims he assaulted her. Second, the appellant maintains that his TDC should have presented MH's 911 call because MH described her intruder as wearing a purple or orange shirt and he was arrested wearing a gray shirt.

We review allegations of ineffective assistance of counsel *de novo*. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012). In assessing the appellant's claim, we apply the two-pronged test from *Strickland v. Washington*. 466 U.S. 668, 688, 694 (1984). In order to prevail, the appellant must show that his counsel's performance fell below an objective standard of reasonableness, and that the counsel's deficient performance gives rise to a reasonable probability that the result of the proceeding would have been different without counsel's unprofessional errors. *United States v. Akbar*, 74 M.J. 364, 371 (C.A.A.F. 2015). In considering the TDC's tactical choices, we afford his decisions wide latitude. *Strickland*, 466 U.S. at 689. Our scrutiny of a TDC's performance is "highly deferential," and we make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the time." *Id.*

---

[57] As discussed *supra*, the text messages were actually sent to AM's sister, but the appellant thought he was texting AM.

Applying *Strickland's* first prong, we do not find the TDC's performance deficient. Even if the appellant was assigned a bridge watch during the time GM alleged the assault occurred, TRUXTON's XO testified that the appellant would not have been required to sign in, so there would be "no indication if he was on deck during that time."[58] We conclude it was a reasonable tactical decision to forego discovery of the bridge deck log since it had limited potential benefit. *Datavs*, 71 M.J. at 424.

Likewise, the TDC's decision not to present MH's 911 call was a reasonable tactical decision which we will not second-guess on appeal. MH testified about her 911 call and the fact that she identified her intruder's shirt color as either purple or orange; the TDC questioned MH about this discrepancy during cross-examination. The issue was, therefore, already squarely before the members for consideration. Playing the 911 call, and having the members experience a frightened victim recounting the break-in, could have made MH more sympathetic and might have bolstered her in-court testimony.

In any event, there is no reasonable probability that either requesting the bridge deck log or presenting MH's 911 call would have resulted in a different outcome.

**F. Challenge for Cause**

The appellant challenged one of the court members, LT B, for actual and implied bias. The appellant argued that LT B knew one of the witnesses, had heard the witness had a poor work ethic, had served as the legal officer when the witness was processed for administrative separation for dereliction of duty, and had served as a recorder at an unrelated administrative separation board for a Sailor accused of sexual assault.[59] The military judge denied the challenge for cause, acknowledging the liberal grant mandate, but finding that LT B knew very little about the witness, had very minimal professional interaction with the witness, and was forthright, assertive, and thoughtful in stressing that he would follow the military judge's instructions.

We review the military judge's ruling on a challenge for cause based on actual bias for an abuse of discretion and we afford the military judge a high degree of deference. *United States v. Woods*, 74 M.J. 238, 243 (C.A.A.F. 2015). Our standard of review on a challenge for cause premised on implied bias, however, is "less deferential than abuse of discretion, but more deferential

---

[58] Record at 700.

[59] The witness in question was a former officer and friend of the appellant's who testified that the appellant told him he had been accused of sexual assault by someone he had caught having sex while he was on duty. *See supra* Part II-B-2b.

than de novo review." *United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016) (citations omitted). But, "where the military judge places on the record his analysis and application of the law to the facts, deference is surely warranted." *Id.*

Actual bias is a personal bias that will not yield to the military judge's instructions and the evidence presented at trial. *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (citation omitted). Here, we find no actual bias where the military judge concluded that LT B credibly and thoughtfully expressed his intention to follow the military judge's instructions.

The implied bias test, on the other hand, is one of public perception. *Woods*, 74 M.J. at 243. The question before us is "whether the risk that the public will perceive that the accused received something less than a court of fair, impartial members is too high." *Id.* at 243-44 (citations and internal quotation marks omitted). We review the totality of the circumstances, and assume the public is familiar with the unique structure of the military justice system. In this case, we conclude that the risk is not so high that the public would question the fairness of the appellant's court-martial.

"[I]t is not an infrequent occurrence in the military for a panel member to know a witness in a court-martial, and without more, we have not found implied bias in such circumstances." *United States v. Akbar*, 74 M.J. 364, 395 (C.A.A.F. 2015). LT B stated that he had little experience as a legal officer and that he did not interact with the witness very closely. Moreover, the military judge's ruling was thorough, and he concluded that LT B's limited experience as a legal officer was not, "in and of itself," a "bias issue"; and, although LT B knew the witness, that is not uncommon in courts-martial.[60] Since the military judge placed his analysis on the record, we afford him the deference that is warranted. We, therefore, conclude that the presence of LT B on the appellant's panel would not cause the public to think that the accused received anything less than a court of fair, impartial members, and would not injure the public's perception of the military justice system.

## III. CONCLUSION

The findings and sentence are affirmed.

---

[60] Record at 330-31.

Chief Judge WOODARD and Judge LAWRENCE concur.



FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court